BOLIN et al. v. WILKES et al.

(Circuit Court of Appeals, Fifth Circuit. March 18, 1918.)

No. 3181.

1. MORTGAGES ⬤⟾37(2)—DEEDS ABSOLUTE ON THEIR FACE—PAROL EVIDENCE.

A conveyance of land absolute in form, without an accompanying defeasance, contract of repurchase, or other agreement in writing, may in equity, by extrinsic and parol evidence, be shown to be a mortgage, without violating the parol evidence rule or the statute of frauds.

2. MORTGAGES ⬤⟾608½—SUITS TO DECLARE DEED A MORTGAGE—INCIDENTAL RELIEF.

As an incident to a suit to have a deed absolute on its face declared a mortgage, court of equity has jurisdiction to declare an accounting for the profits received from the property.

3. MORTGAGES ⬤⟾32(3)—DEED ABSOLUTE IN FORM.

While the relation of debtor and creditor is essential to the existence of a mortgage, a conveyance absolute in form, but as security for debts of the grantor, which the grantee agreed to assume, will be treated in equity as a mortgage; the debts not being extinguished by the conveyance.

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
249 F.—45

4. MORTGAGES &wkey;591(3)—EQUITY OF REDEMPTION—EXTINCTION BY AGREE-MENT.

The parties to a mortgage cannot, by any stipulation or contract there-in or contemporaneous therewith, extinguish the right of redemption, and this is so though the conveyance be absolute in form; 'and hence, in the absence of an estoppel or a release of the equity of redemption, the right of redemption persists in the mortgagor and may be enforced.

5. MORTGAGES &wkey;596, 597—EQUITY OF REDEMPTION—RELEASE AND ESTOPPEL.

A mortgagor may, by an agreement based on sufficient consideration and entered into after the execution of the mortgage, release his equity of redemption; likewise he may estop himself from asserting that right.

6. MORTGAGES &wkey;37(2)—SUIT TO HAVE DEED DECLARED MORTGAGE—PAROL EVIDENCE.

Where land was conveyed by deed absolute on its face as security for a debt, and a representative of the grantor remained in possession of either the whole or a part of the premises, Code Miss. 1906, § 4783, de-claring that a conveyance or writing absolute on its face, where the maker parts with possession, shall not be proved by parol evidence to be a mortgage, unless fraud in its procurement be the issue to be tried, has no application.

7. MORTGAGES &wkey;608½—SUIT TO HAVE DEED DECLARED MORTGAGE—AVER-MENTS OF FRAUD.

A bill seeking to have a deed absolute on its face of lands partly located in Mississippi declared a mortgage, which alleged that the de-fendant induced the grantor, an old man, who was in difficulties, finan-cial and otherwise, to have the lands conveyed to her under an agree-ment that she would pay off indebtedness and would reconvey the prop-erty upon being reimbursed, that the offer was made with intent to defraud, and that after securing the conveyance defendant made exces-sive demands and prevented the grantor from repaying her advances, etc., sufficiently charges fraud to take the case out of Code Miss. 1906, § 4783.

8. EQUITY &wkey;141(1)—MORTGAGES &wkey;608½—BILL TO DECLARE DEED A MORT-GAGE—SUFFICIENCY.

The sufficiency of a bill is not to be determined by a consideration of whether the pleader will be able to establish his allegations; so a bill seeking to have a deed absolute on its face declared a mortgage is not subject to attack under Code Miss. 1906, § 4783, on the ground that the character of the instrument could only be established by parol, where the bill set up writings showing the mortgage character of the deed.

9. MORTGAGES &wkey;37(2)—SUIT TO DECLARE DEED A MORTGAGE—PAROL EVI-DENCE.

Under Code Miss. 1906, § 4783, declaring that a conveyance absolute on its face, where the maker parts with possession, shall not be proved by parol evidence to be a mortgage only, unless fraud in its procurement be the issue to be tried, parol evidence is admissible to show that a written memorandum, executed by the grantee, acknowledging mortgage character of a deed absolute on its face, was delivered, and that the person to whom it was addressed was acting for the grantor, since, like the statute of frauds, this statute would not exclude all oral evi-dence, where controlling and essential features are established by writ-ten evidence.

10. FRAUDS, STATUTE OF &wkey;63(5)—TRUSTS—DEEDS ABSOLUTE ON FACE—MORTGAGES.

Code Miss. 1906, § 4780, declaring that declarations or creations of trusts shall be made and manifested by writing, but that, where any trust shall arise or result by implication of law out of a conveyance of land, such trust shall not be affected by the statute, by its own terms excepts a mortgage created by deed absolute on its face.

&wkey;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of Mississippi; Henry C. Niles, Judge.

Bill by E. E. Bolin, trustee for William Schild, and another, against Mrs. E. E. Wilkes and others. From a decree dismissing the bill, complainants appeal. Reversed.

Bolin, as trustee for William Schild, and another, filed a bill in the District Court for the Southern District of Mississippi, against Mrs. E. E. Wilkes and others, making, in addition to formal statements, allegations, in substance, as follows:

(1) William Schild, in October, 1916, executed to Bolin, trustee, a deed of trust conveying the real property in controversy.

(2) In 1906 Schild procured from the Grenada Bank a loan of $17,000, and pledged as collateral $33,000 of the notes of the Southern Land Company, secured by a trust deed on part of the land in controversy. This loan was reduced by payments, until on October 9, 1912, the indebtedness amounted to $3,976.99. The Southern Land Company failed to pay its notes, and the property described was sold under foreclosure, bid in in the name of the bank, and conveyance made to it, to be held in trust for Schild, and as security for the balance unpaid on his indebtedness. When the original loan was made, and as further security, Schild conveyed another part of the property in suit to J. T. Thomas, president of the bank. During the period the title to these properties was thus held, from 1906 to 1912, Schild paid the taxes and was in possession of the property, collecting the rents therefrom. When the loan was made, Thomas, acting for the bank, executed a trust agreement, whereby he agreed to hold the title as trustee, and, when the notes were paid, all property and land held as collateral were to be reconveyed to Schild, or to whomsoever he might direct. When the Southern Land Company defaulted, the bank purchased the land sold under the deed of trust of the Southern Land Company, and held the same in trust as security for the debt due by Schild: the land being substituted for the notes primarily held as collateral. In the year 1911, and until June, 1912, Schild was in a sanitarium at Biloxi, and later in the insane hospital at Jackson, where he received treatment for nervous trouble. When he returned, he was advised by the bank that the balance due on the notes must be paid on or before December 1, 1912. The bank at that time recognized that the beneficial title was in Schild, and that the lands were held under the trust agreement. On August 11, 1912, Schild was due the bank $3,987. To give him time in which to arrange to secure money to pay the debt, an extension to December 1, 1912, was granted by a writing dated September 13, 1912.

(3) At various times prior to 1906 Schild purchased the balance of the property described in suit, and had conveyances made to his wife, Mrs. J. M. Schild. On September 30, 1911, Mrs. Schild executed a trust deed, securing $2,000, to R. E. Howard, conveying the land to J. E. Ham, trustee. On September 30, 1911, she executed a second trust deed to secure $2,600. On September 14, 1912, all of this property conveyed to Ham, trustee, was conveyed to Schild by Mrs. Schild in a property settlement had between them; this conveyance being subject to the two deeds of trust securing debts amounting at that time to $3,135.

(4) After the discharge of Schild from the insane hospital, he found that large property holdings, other than those involved here, had been dissipated. During the month of September the bank insistently demanded payment of the balance of the $17,000 loan. About the time of his release, his brother Joel Schild had been making efforts to procure the necessary money to pay off this indebtedness to the bank. Defendants Mrs. E. E. Wilkes, B. B. Wilkes, and John Wilkes were aware of Schild's confinement and of the threatening attitude of the bank with reference to the indebtedness. Mrs. E. E. Wilkes volunteered to Joel Schild to lend the necessary money to pay the bank debt, and to take title to the properties held in trust by the bank, the property to be held by her under all the conditions under which it was held by the bank. In furtherance of this, and to ascertain accurately the situa-

tion, Mrs. Wilkes on September 5, 1912, addressed a letter to Thomas, the president of the bank, stating that Joel Schild had applied for money to pay off the loan, and that whenever the money was repaid, which she had agreed to advance, the title would be reconveyed. The Wilkses had actual notice of the terms under which the bank and Thomas held the property under a written agreement. Some time after the release of William Schild he was apprised by his brother of the offer of Mrs. Wilkes, and was notified by Thomas, president, that Mrs. Wilkes would take up the debt and hold the property in trust. Thomas wrote a letter to Schild, explaining why it would be to his advantage to allow Mrs. Wilkes to take up the indebtedness. While in the latter part of October, 1912, William Schild was negotiating with friends to secure money to take up the debt due the bank, and had arranged and was about to consummate the loan, the offer theretofore made by Mrs. Wilkes was made directly to him; the offer, however, being conditioned upon Mrs. Wilkes' being permitted to take up, not only the indebtedness due the Grenada Bank, but the indebtedness secured by the two deeds of trust to Ham. It was a part of the inducements held out to Schild that, as to the property held by the bank, the title to be taken and held by Mrs. Wilkes was subject to the terms and incidents of the trust agreement executed by the bank. The loan was accordingly agreed upon, interest to be at 6 per cent., and there was to be no date of maturity. It was further agreed that the two trust deeds then held by Ham should be foreclosed and the property sold under the trust deeds, and should be bid in for the benefit of Schild for the amount of the debts—that is, $3,135—which was to be paid by Mrs. Wilkes, but with the specific understanding that the title should be held for the benefit of Schild, and as a part of the security for the loan. By subsequent agreement Schild agreed to pay $135 of the amount due under the two trust deeds, reducing the aggregate loan to $6,976.99. In consummation of this agreement, Mrs. Wilkes, on or about November 1, 1912, paid the amount due the Grenada Bank from Schild, and the properties theretofore held by the bank and Thomas were conveyed to her. In consummation of the agreement, Ham, trustee, made sale of the properties conveyed to him in trust for the amount of the debt due, $3,135; Mrs. Wilkes paying him such amount, but receiving from Schild $135, in accordance with the agreement. It was part of the agreement that title to all the properties covered by the trust deeds to Ham should be subject to the terms existing with reference to the properties theretofore held by the bank, in recognition whereof Mrs. Wilkes thereafter agreed in writing that title to all of said property was held for the benefit of Schild, and as security, and that she would reconvey upon payment of the indebtedness to her. Friendly relations between the Schild family and the Wilkes family had existed for many years. Mrs. Wilkes and her representatives knew that Schild had just returned from the insane hospital; that he was very much embarrassed financially, and had unfortunate domestic troubles. Mrs. Wilkes, acting under the pretense and guise of friendship, represented that she had no desire to do other than to render Schild financial aid, for the purpose of saving his property from being sacrificed at foreclosure sales. Schild, believing said offer was in good faith, consented to Mrs. Wilkes' taking title to his properties, and, relying upon her representations, arranged for the transfer to her as successor in trust to the bank and Ham. After conveyance made Mrs. Wilkes and her representatives repeatedly acknowledged that all of the property was held in trust for Schild, and stated that whenever the indebtedness was paid, either in cash or from rents and profits arising from the property, she would immediately reinvest Schild with title. Mrs. Wilkes and her representatives were not in good faith in any of their offers to assist Schild in his financial distress; but they, with full knowledge of all the circumstances and conditions, took advantage of him for the purpose of fraudulently procuring legal title to all of his property, and after she had received the rents and profits therefrom, and waited for a sufficient length of time to elapse for the purpose of lending color to her now pretended claims to absolute title and ownership, she now claims absolute title and beneficial ownership against Schild, in fraud of his rights

and in violation of the trusts under which she accepted titles, and all of the representations, inducements, and agreements made by her to Schild when conveyances were procured by her. She now claims the right to exclusive possession, and to be in exclusive possession, of all the property, in disregard and violation of the rights of Schild. The conveyances from the bank and Ham, trustee, to her, were all procured by fraud, and with the ulterior intent on her part to defraud Schild of his interest in all the properties, and, through such fraud, to ultimately assume the absolute ownership and to defeat the equitable ownership of Schild. In furtherance of said scheme, when Schild was at divers times offered reasonable and fair prices for timber on portions of the properties, or was offered reasonable and fair prices for portions of the land, she, while admitting that he was the beneficial owner, discouraged the sale at such time, assuring Schild that there was no necessity of his selling, inasmuch as she would continue her trust and postpone payment of the loan until the rents and profits should repay the indebtedness to her, or until it was convenient for Schild to repay in cash. On each occasion, when opportunities for sale of land or timber arose, Schild offered to apply the proceeds on the indebtedness, and on each occasion he failed to avail himself of the opportunity, relying on the assurances of Mrs. Wilkes that she would continue to hold the title in trust without pressing him on his debt. A large portion of the land was then in cultivation and rented, and bore large rentals, which it was agreed should be paid to Mrs. Wilkes on the loan. It was a part of the understanding on which the loan was made that the rentals should be applied, first, to the payment of taxes, and would, within a few years, pay out the loan and interest, in the event Schild should not sooner pay in cash. Schild paid in cash a portion of the taxes after title was vested in Mrs. Wilkes, and the renting of the land has always been under his supervision. Parts of the property, described as the Lipsey place, and a few acres, described as the Bentwood place, and the houses in the town of Durant, and the property in St. Joseph county, Mich., are the only properties susceptible of actual occupancy. While Schild was confined in the asylum, his brother had control of said properties, and rented them and collected rentals. When title was vested in Mrs. Wilkes, it was agreed that Joel Schild should continue to rent the property as the representative of Schild. Shortly thereafter Joel Schild was induced by Mrs. Wilkes to move on the Lipsey place for the purpose of terminating the general supervision by Schild, and to restrict his supervision to the Lipsey place, with the agreement, however, that all rentals should be applied as credits on the indebtedness of William Schild to her. The removal of Joel Schild to the Lipsey place was not intended as a surrender of the right of possession, but with the distinct understanding that the rents should thereafter be merely received by her and applied as credits on the loan. Ever since the moving of Joel Schild to the Lipsey place he has been in occupancy and control, and supervised the tenants, for the purpose of the application of rents and profits to the reduction of the indebtedness. All the rentals have been received by Mrs. Wilkes, and should have been, under the terms of the agreement, applied to the indebtedness. No due date of the loan was fixed, because it was estimated that the net rentals would satisfy the same in a few years. It was agreed that Schild should be permitted to pay off the loan at any time, although he was induced to believe that he would never be pressed for payment, but that the debt would be gradually retired by rentals. Over and above all taxes and proper charges on the land since November 1, 1912, the net rentals received by Mrs. Wilkes have been more than sufficient to repay the loan and interest, and she is now indebted to plaintiff as trustee for William Schild in the amount of the excess. A large portion of the property was wooded with valuable timber. Shortly after the loan was made, Schild was offered $6,500, net, for the oak, hickory, and gum timber on the property. He was then advised by Mrs. Wilkes not to accept this offer, and that it would be to his best advantage not to dispose of the timber, but that the rents would be ample to pay taxes and retire the loan. At this time there were some 1,350 acres of land in timber, a large portion of which was in a

virgin state; that, notwithstanding Schild was discouraged by Mrs. Wilkes from disposing of any of the timber, and notwithstanding the agreement that none should be cut or disposed of, timber of value far in excess of the original loan has been cut from the land and disposed of by Mrs. Wilkes, the exact amount plaintiff being unable to state. Plaintiffs are informed, and state on information and belief, that Mrs. Wilkes has recently sold to defendant V. Reinhardt a large amount of the timber now standing on the land, the amount of which and description of the land from which it is to be cut being unknown to plaintiff; that the sale, if made, is unlawful, and ·in violation of the agreement.

(5) Defendant Mrs. E. E. Wilkes had repeatedly recognized and admitted that Schild is the beneficial owner of the lands, and that same had been held by her merely as security. From time to time Schild endeavored to obtain statements from her of the amount then due her, and she has failed and refused to render any itemized statement, and has likewise never rendered any statement of rents, issues and profits from the lands, her only response to de-' mands having been to state, in various writings, aggregate balances claimed to be due her. These balances were fraudulent and inflated, and their pay-ment was required of Schild before he could obtain a reconveyance of his property. With a full knowledge on her part that Schild was unable to pay such excessive amounts, said requirements were made for the fraudulent and unlawful purpose of defeating his right to reconveyance, and of unlawfully and fraudulently withholding his property. That the original loan of $6,976.99 is the only money ever received by Schild from Mrs. Wilkes, and an accounting will show that said sum and all proper interest has been paid, and that there is a balance due him. When each of said fraudulent statements was rendered, Schild denied liability for the amount claimed, and has never acquiesced in the justice of any of said claims, except to the extent of the proper balances then due. That Schild is a very old man, worn down by great vicissitudes and misfortunes and the weight of years. With the exception of the properties herein involved, he has been denuded of a large fortune, and the properties herein in suit constitute all left to him. Except ·by acceding to the unjust and excessive claims, he has been utterly unable to reach any amicable adjustment with Mrs. Wilkes. He has been without funds during the entire period of the transactions, and altogether unable to obtain financial aid necessary to enforce his rights. On several occasions, after Schild would call for statements, and excessive amounts had been claimed, he, being without funds and unable to stand the expense of litigation, took up negotiations with her, in an effort to fix the proper amount. On various occasions she had given written statements that she would convey the property upon payment to her of these amounts. Oppressed by want, and without the means to enforce his rights, but at all times denying liability for the amount claimed, Schild, at various times, undertook to secure money to pay the excessive demands, and further sought to sell portions of the property for that purpose. On several occasions he has found persons willing to lend him sufficient money to pay such excessive demands, but the consummation of the loans has been prevented through the active and fraudulent interference of Mrs. Wilkes or her representatives. On two occasions Mrs. Wilkes actually. executed deeds reconveying property involved, which were deposited in escrow, notwithstanding all of which the proposed loans were defeated through her fraudulent interference, and with intent on her part to retain possession of the property. The property is worth $56,525. Defendants B. B. and John Wilkes attend largely to the business of E. E. Wilkes, and have been active participants in all the transactions complained of. B. B. Wilkes and John Wilkes have been suffered to receive, use, and enjoy a large part of the rents and revenues collected from the property and the proceeds of the sale of timber. Diligent efforts to ascertain the amount of timber cut by them have been without success, and the amount or value of the timber taken cannot be stated with accuracy. The ascertainment of the amount of rents and profits, and the amount and value of the timber involves a complicated state of accounts; much of the land having

been rented on shares, and the sales of the timber involving transactions with numerous persons. Plaintiffs are entitled to an accounting, to the end that the amount of the rents and profits, and the amount and value of the timber cut and the respective liabilities of defendants, may be ascertained. Plaintiffs deny that any amount is due to Mrs. Wilkes; but, if mistaken, they are unable to make tender until the amount has been ascertained upon an accounting, and they express a willingness to do anything which the court may find equitable to entitle him to a redemption of the property. They are entitled to have a conveyance from Mrs. Wilkes of all the property, and a full discovery from the defendant Reinhardt of the timber taken and of the contracts made with him, and the price, date, and terms of the sales and of the amount paid, and to have the proceeds of the sale impounded, and, pending the determination, are entitled to a receiver to collect the rents, issues, and profits, and also entitled to have injunction against any further disposition, by sale, removal, or otherwise, of any timber, and of the collection of any rents.

Plaintiffs pray: (1) That the account be stated between Schild and Mrs. Wilkes. (2) That defendant Reinhardt make discovery of all facts relating to any sales to him of timber. (3) That pending the suit an injunction issue, restraining the defendants from cutting timber, and from collecting any rents, etc. (4) That a receiver be appointed to take possession of the property, etc. (5) That plaintiffs be permitted to make payment of such amounts as may be found to be due, and that Mrs. Wilkes be compelled to convey the lands to Bolin, trustee. (6) That plaintiffs have judgment against defendants for such amount as may be found due them. Prayer for general and equitable relief.

Among the exhibits attached to the bill are: Exhibit No. 2: Document signed by Grenada Bank, agreeing to sell to William Schild the property held by the bank in trust to secure his debt for the sum of $3,987, with interest from August 11, 1912, at 10 per cent.; taxes for 1912 to be paid by Schild; limited to December 1, 1912, and accepted in writing by Schild. On the back a note addressed to Grenada Bank, and signed by William Schild, directing the bank to make deed to E. E. Wilkes for the amount of the indebtedness. Exhibit No. 3: Letter from E. E. Wilkes to J. T. Thomas, with reference to taking up the indebtedness to Schild. Exhibit No. 4: Letter from J. T. Thomas, president, to William Schild, dated October 17, 1912, suggesting that he permit Mrs. Wilkes to take up the loan to the bank, and suggesting that a deed to the property could be made direct to Wilkes, in trust for Schild. Exhibit No. 5: A statement, signed E. E. Wilkes, of the indebtedness due from Schild, with a statement: "This includes all indebtedness due to date on property deeded to E. E. Wilkes by the Grenada Bank and J. E. Ham, trustee, which we will deed on payment of above."

Defendants filed motion to dismiss for the following grounds:

(1) The plaintiffs have a plain, adequate, and complete remedy at common law.

(2) That the plaintiffs have not made a case entitling them in a court of equity to any discovery or relief.

(3) That, according to the allegations of exhibits, the title was acquired by E. E. Wilkes through absolute deeds of conveyance; that said Mrs. E. E. Wilkes, ever since receiving said absolute conveyances, has been in possession and control of the land, and using the proceeds; that, while allegations are made that there were written acknowledgments of interest, no such writings are set forth in said bill, nor made exhibits, and therefore no such writings would be admissible in evidence in support of the bill; and that the allegations in relation to the writings are incompetent, irrelevant, and insufficient.

(4) That the bill seeks to enforce parol contracts for the redemption of each of the different tracts of land, upon a showing that Mrs. Wilkes acquired them by absolute and valid and unconditional deeds, and that said agreements or pretended contracts as to redemption are all oral, and therefore are void under the statute of frauds (Code 1906, § 4775), which provides:

"An action shall not be brought whereby to charge a defendant or other party * * * upon any contract for the sale of lands, tenements or hereditaments, or the making of any lease thereof, for a longer period than one year," unless the contract of sale or lease shall be in writing.

(5) That all the pretended contracts in relation to redemption or repurchase of said lands show that such pretended contracts are not in writing, and are void, because the same are not to be performed in one year from the making thereof, which statute of frauds is hereby specially pleaded.

(6) That, as shown, Mrs. Wilkes received absolute deeds to all the different tracts, and went into immediate possession of each of said tracts immediately after receiving said deeds thereto, and is still in possession of said property. Said absolute deeds cannot, on the showing of said amended bill, be converted into a mortgage or like instrument by parol evidence.

(7) That there is no cause of action, either with reference to the granting of an injunction or the appointing of a receiver.

(8) That there is no equity on the face of said amended bill, nor cause of action therein set forth.

(8½) That there is no allegation showing the creation of trust and confidence relation was in writing, signed and acknowledged and filed for record, as required by section 4780 of the Code of 1906.

(9) That the bill waives oath of defendant, and thereby deprives defendants of the privilege of using their answers to the matters of discovery called for as evidence, and thereby dispenses with such discovery by defendants and each of them.

(10) That said bill, as amended, seeks to establish, by parol evidence and proof, agreement to convey an estate, an inheritance or freehold in land, in violation of section 2763 of the Code.

(11) The bill shows that neither E. E. Wilkes, nor any agent of hers appointed in writing, made any written agreement in reference to said land.

The court sustained the motion to dismiss the bill, upon the grounds enumerated in exceptions Nos. 1, 2, 3, 4, 5, 6, 8½, 10, and 11; the seventh, eighth, and ninth being overruled.

C. L. Sivley and John H. Poston, Jr., both of Memphis, Tenn., for appellants.

E. F. Noel, of Lexington, Miss., for appellees.

Before WALKER and BATTS, Circuit Judges, and NEWMAN, District Judge.

BATTS, Circuit Judge (after stating the facts as above). [1, 2] The general principles upon which this case is to be decided are too well settled in equity jurisprudence to require extended statement or citation of authority. A conveyance of land, absolute in form, and without an accompanying defeasance, contract of repurchase, or other agreement in writing, may, in equity, by extrinsic and parol evidence, be shown to be a mortgage, and an incident to a suit for that purpose may be an accounting for fruits and profits received from the property. The admission of the parol testimony is held not to contradict or vary a written instrument, and not in contravention of statutes of frauds. The bill is apparently good in substance and form, and, unless there is something in the statutes of the state of Mississippi which changes the general rules to be applied, it must be held sufficient. Appellees, in discussing the case, make a number of propositions, each of which will be considered.

[3] I and V. Appellees' first proposition is that:

"No relation of creditor and debtor, or other elements of mortgage, are established."

Not only is it the case that the relation of debtor and creditor must subsist as a prerequisite to the existence of the mortgage, but it is also the case that, when such relation does exist, and a conveyance is made in which the debt is the consideration, and the debt continues to exist, notwithstanding the conveyance, the instrument will be a mortgage, and will have all the legal incidents of a mortgage with clauses of defeasance. In this case each of the pieces of property involved was conveyed to Mrs. Wilkes by a conveyance, absolute in form. Two of the lots were conveyed to her in a foreclosure sale. The other property was sold at public auction under foreclosure proceedings, and conveyed to the Grenada Bank, and by it conveyed to Mrs. Wilkes. The total amount of the consideration paid by Mrs. Wilkes was the exact amount of the debts due by Schild upon the properties conveyed to her. The allegations of the petition are to the effect that she suggested, before the conveyances were made to her, that she would take up the debts of Schild, provided the debts and the security were consolidated, and that she would so administer the property as to discharge the indebtedness from rents and profits, or permit Schild to pay the amount due at any time in cash. According to the further allegations of the petition, she repeatedly thereafter recognized the existence of the indebtedness, and stated accounts which it would be necessary to discharge before a reconveyance of the property. One of these statements was in writing, indicating the amount claimed by her, and stating that she would deed the property upon its payment. The existence of a debt is essential to the existence of a mortgage, and the existence of the debt in this case is amply and repeatedly alleged in the bill.

[4, 5] II. The second proposition made by the appellees is:

"Mortgages can be defeated and superseded by agreements subsequently made, by waiver or estoppel."

The general proposition is that a mortgagor cannot, at the time of the making of the mortgage, by any stipulation or contract therein or contemporaneous therewith, preclude his right to redeem. The nature of the instrument, whether in the ordinary form of a mortgage or in the form of an absolute conveyance, cannot by any contract then or thereafter made, be changed. It is, of course, the case that the right which remains in the mortgagor, whether considered as an equitable right (the legal title being in the mortgagee), or as ownership of the property (a lien existing for the benefit of the mortgagee), may be disposed of by him. He may, upon a sufficient consideration and in a proper way, release his equity of redemption to the mortgagee. He may also part with his right of redemption or his title to the land by authorizing, for that purpose, conveyance by the mortgagee to a third person; and it may be that conduct or declarations on his part might amount to waiver or estoppel, precluding the remedy he would otherwise have. Nothing, however, in this bill indicates either an agreement with the mortgagee that his equity of redemption or other rights should pass to her. or the existence of any fact or conduct upon which a waiver of right to redeem, or giving rise to an estoppel to assert the right, might be predicated.

As to the land held by the Grenada Bank, and that held by Thomas, the president of the bank, the petition alleges that, while the title was held under conveyances absolute in form, it was held as security for the debt. While it would have been possible for a conveyance from these trustees to Mrs. Wilkes to have passed the absolute title to the land, this legal result could not follow, except by some instrument executed by Schild, or some conduct upon his part making the act of conveyance his own act; such instrument or conduct evidencing an intent that she should hold title to the land under terms different from those under which it was held by her grantors. No instrument which could have been executed, and nothing which could have been done by Schild, could have destroyed the effect of the continuance of the debt, when, there being no other consideration, the land was conveyed by the creditor who held it as security, in consideration of the taking up of the debt for the benefit of the debtor. While it might have been possible for Schild to have parted with his equity of redemption to Mrs. Wilkes, by having conveyances made by the trustees in whom was the legal title to the land, the circumstances detailed by the bill absolutely negative such an intention and such a result.

The propositions made are applicable to the land secured from the sale by Ham, trustee.

[6] III, X, and XI. Appellees' third proposition is:

"Section 4783 of the Code of 1906, prohibits mortgages to be established by parol evidence."

Section 4783 of the Mississippi Code of 1906 is to this effect:

"A conveyance, or other writing, absolute on its face, where the maker parts with the possession of the property conveyed by it, shall not be proved, at the instance of any of the parties by parol evidence, to be a mortgage only, unless fraud in its procurement be the issue to be tried."

In the consideration of this section of the Code of Mississippi, a preliminary question might arise as to the power of a state to enact a law of evidence, or other law, which would have the effect of curtailing the jurisdiction of a federal court, or destroying or affecting the established remedies of such court. Nothing is more firmly established than the rights of courts of equity to declare instruments, absolute on their face, to be mortgages, and to receive parol evidence of the intent and purpose of the parties in the execution of such conveyances. To give effect to the provision of the Code cited would be to limit the remedy in federal courts to cases where fraud is charged, and to those in which the maker of the conveyance under consideration retained possession of the property. The application which we make of the facts in this case to the Mississippi statute will render it unnecessary to determine whether such an effect would be permissible.

Under the section of the Code quoted, a conveyance, absolute on its face, shall not be proved by parol to be a mortgage, unless the party making the conveyance retains the possession of the property, or unless fraud in its procurement be the issue to be tried. While the conveyances under which Mrs. Wilkes claims were made by the bank and Thomas, the president of the bank, and Ham, the trustee, it will

be assumed that, having been made for the benefit of Schild, delivery by him to Mrs. Wilkes of possession would be a parting contemplated by the statute. The allegations of the bill do not indicate delivery by him to Mrs. Wilkes. It is stated that the property described as the Lipsey place, and a few acres of the property described as the Bentwood place, and the houses located on lands in the town of Durant, and the property lying in St. Joseph county, Mich., are the only properties that are susceptible of actual occupancy, and that during the period of the confinement of Schild in the asylum his brother had control of the properties and attended to their renting and the collection of rentals therefrom. It is alleged that, when the titles were vested in Mrs. Wilkes, it was understood and agreed that Joel Schild should continue in charge of the renting, as the representative of William Schild. There is nothing in the bill to indicate that there was at that time any change in the occupancy of the property. The law would have reference to that date, and not to a subsequent date. There are allegations to the effect that afterwards Joel Schild was induced by Mrs. Wilkes to move on the Lipsey place for the purpose of terminating the general supervision of the properties; but it was stated that this moving was not intended as a surrender of the right of possession of William Schild. It also states that ever since the moving of Joel Schild to the Lipsey place he has been in occupancy and control thereof, and has supervised the various tenants thereon. Even if it could be said that possession of a part of the property was, at the time of the making of the conveyance, placed in Mrs. Wilkes, the failure to turn over all of it to her would prevent the application of the statute.

[7] The quoted section of the law of Mississippi does not, by its terms, have application to a case where fraud in the procurement of the conveyance is the issue to be tried. Under the proposition now considered, and also in the proposition made under subdivision XI of his brief, counsel for appellees question the sufficiency of the charges of fraud. It is stated that the charge of fraud in the procurement of the conveyance is "shifty," and it is said, quoting from a Mississippi case:

"Where fraud is relied on as a basis of relief sought from a chancery court, the facts on which the charge is predicated must be specifically stated with full definiteness of detail."

It is settled that generalizations with reference to fraud will not be sufficient. The bill is not subject to the charge that it lacks in definiteness. The facts, from the proof of which fraud is to be inferred, and from which it is charged, are set forth with as great a degree of particularity as their character will permit. If the elements of fraud are simple, the pleading will not be held insufficient because complexity is not introduced into a statement of them. Not only is the fraudulent design charged, but there is a statement of how it was to be accomplished, and a statement of much of the evidence by which it is to be established. The following facts are specifically set forth: That Schild was an old man, who had had financial and family troubles, and who had just returned from an asylum for the insane; that im-

716 249 FEDERAL REPORTER

mediately after his return he was pressed by the Grenada Bank for the payment of a debt due to the bank; that, while he was undertaking to secure money with which to discharge the debt, Mrs. Wilkes, professing friendship for him, indicated a willingness to take up the debt due to the bank for the security held by the bank, provided she were permitted also to take up another debt secured by other property, and make all of the property responsible for all of the debts. It is charged that this proposition was made with the fraudulent intention of placing all of the property of Schild so that none of it could be used in discharging any part of his indebtedness, whereby all of the property of Schild might be secured. It is charged that, after securing conveyances to the property, she made excessive demands with reference to the amount of the indebtedness due upon the property, with the fraudulent intent to prevent its redemption. It is also charged that, when Schild undertook to sell the property, she discouraged the sales by promising to carry the debt until it was discharged by the rents and profits. When Schild secured purchasers for the land, she, according to the allegations of the bill, prevented the prospective purchasers from consummating the purchases.

[8] It has been held that a mere effort to prevent a conveyance, absolute in form, from having its true status as a mortgage fixed, is fraudulent. In this bill the fraud is charged throughout, and charged with sufficient definiteness and particularity. The entire discussion of article 4783 is, perhaps, unnecessary. There is nothing in that article which undertakes to regulate the manner of pleading. A number of the allegations of the bill are, according to the terms of the bill, to be established by instruments in writing; but this recital as to such allegations does not carry the inference that the others are to be proved by parol. The sufficiency of a bill is not to be determined by a consideration of whether the pleader will be able to establish his allegations.

[9] The exhibits to the petition indicate that the controlling allegations of the bill could be established by evidence in writing. Assuming that article 4783 has application, it would doubtless have the construction given to the provisions of the statute of frauds, and would not exclude all oral testimony in the trial of a case, when the controlling and essential features are established by written evidence. The letter of Mrs. Wilkes to the president of the bank, of date September 5, 1912, establishes that prior to the conveyance it was contemplated that the property would be taken over to secure payment of the sum there named. The status of the title to the lands in the name of the bank, and of Thomas, president of the bank, is indicated by writing. After the conveyance had been made, a memorandum, signed by Mrs. Wilkes, gives the indebtedness which she is claiming from Schild, and states:

"This includes all indebtedness due to date on property deeded E. E. Wilkes by Grenada Bank and J. E. Ham, trustee, which we will deed on payment of above."

The only evidence that it would be necessary to introduce would be to show that Joel Schild, mentioned in the letter of Mrs. Wilkes, was

acting for his brother, and that the statement last referred to was delivered to Schild. Even if the article of the Mississippi statute is entirely applicable, the necessary oral testimony would properly be admitted.

[10] IV, VI, VII, VIII, IX, and X. By subdivisions 4, 6, 7, and 8 of the argument, certain other sections of the Mississippi statute of frauds are quoted, and undertaken to be applied to the facts of this case. It will again be sufficient to state that the ruling complained of in this case is the dismissal of the bill as upon a demurrer, and that there could be, on that account, no application of the rules of evidence by which the facts alleged were to be established.

If this were not true, however, the quoted sections would not prevent the introduction of parol testimony to establish the character of the conveyance, absolute in form, under which Mrs. Wilkes undertakes to hold. All of the rulings which have permitted courts of equity to accept parol evidence for the purpose of showing the character of the conveyance as a mortgage have been made in jurisdictions where statutory provisions in almost the exact form of the Mississippi statute of frauds have obtained. In substance, these rulings have been based upon the idea that the conveyance, absolute in form, is not upon "any contract for the sale of lands," or "the making of a lease thereof for a longer term than one year," or "upon agreement which is not to be performed in the space of a year" (section 4775), or the making of "an estate of inheritance or freehold for a term of more than one year" (section 2763). Section 4780 of the Mississippi Code, by its express terms, excludes its application to conveyances of the character here in question.

This observation disposes also of subdivisions 9 and 10 of the argument.

XII. Subdivision 12 of the argument is to the effect "the demurrer was properly taken and correctly sustained." This contention has, we trust, been answered.

Upon the allegations of the petition the plaintiff is entitled to have the conveyance declared a mortgage, to an accounting, and to the other relief asked, except the appointment of a receiver. It is alleged that there are a number of tracts of land which should be rented, and that a part of the property consists of timber lands, which require attention. It may be that the trial judge will find it advisable to appoint a receiver.

The judgment dismissing the bill is reversed.