CALDWELL, trustee, *v.* HILL *et al.*

No. 9933. SEPTEMBER 15, 1934.

*Anderson, Cann & Cann,* for plaintiff in error.
*Adams, Adams & Douglas,* contra.

GILBERT, J. R. H. Hicks conveyed to Caldwell, as trustee, described property real and personal, situate in Chatham County, for the purpose of securing an issue of bonds. Caldwell was and is a resident of Davidson County, Tennessee. Hill and two others, all residents of Tennessee, constituting a committee representing a majority of the holders of bonds secured by the deed, filed in Chat-

ham superior court a petition seeking the removal of Caldwell as trustee. Service upon Caldwell was made by publication. He filed a plea to the jurisdiction, general and special demurrers, and an answer. The court overruled the plea to the jurisdiction, and the general demurrer. The judge filed an opinion in which it was held that the proceeding was one in rem, within the provisions of the Civil Code, § 5554, par. 6, 7, and stated that such was the contention of petitioners. The defendant excepted and assigned error on the rulings of the court. The plea to the jurisdiction was upon the ground that the defendant had at all times been a resident of Tennessee; that the action was not one in which he could be served by publication under the laws of Georgia and the United States; that only the courts of Davidson County, Tennessee, have jurisdiction of the defendant, and that the service by publication was in violation of the due-process clause of the fourteenth amendment to the Federal constitution. No evidence was introduced. The issue raised by the plea was submitted to the court without a jury. The general demurrer was upon the ground that the allegations of the petition were not sufficient in law to entitle the plaintiffs to maintain their action. The causes alleged for the removal of the trustee were that he was insolvent; that he was surety on various bonds securing deposits in banking institutions; that there were outstanding against him unsatisfied judgments for large amounts; that he had improperly caused deposits, in banking institutions controlled by him, of moneys paid to him as trustee, and these moneys had been lost by the closing of those institutions; that he had been convicted of fraudulent breach of trust in the courts of Tennessee; that he had acted without the consent and contrary to the wishes of the bondholders; and that in one instance he had appropriated as an alleged trustee's fee funds in his hands as trustee, and had refused to resign after request of a majority of the bondholders.

The contention of counsel for the defendant is that the provisions in the Code of 1910, § 5554, for service by publication are not applicable in the present case, because they are restricted to cases "in which the subject of the action is real or personal property in this State," and "no property is the subject of this action;" that the action is purely one for the removal of the trustee; that the petition shows that the property is actually within the control and jurisdic-

tion of the District Court of the United States for the Southern District of Georgia under a bill to foreclose, brought by the trustee; that the present action is in personam and not in rem, and any judgment rendered therein must be "personal to himself alone;" and that no judgment can be rendered in this case which will in any way affect the property of the trust estate.

Among the provisions contained in the security deed the following are pertinent to the issues raised in the case:. The title was conveyed "to secure the payment of said indebtedness and said bonds and coupons evidencing same, and to secure the payment of other indebtedness and charges which may hereafter arise and for which the said owner may be liable, . . and to secure all of the covenants, conditions, and agreements herein by the owner undertaken to be kept and performed." The trust deed sets out a copy of the bond, in which it is recited that the trust deed is made "for the benefit of the holders of said bonds and coupons, and such trust deed is hereby referred to, and as to all of its terms and provisions is hereby made a part of this bond." It conveys the property to secure the indebtedness evidenced by the bonds and coupons, and to secure the execution of the trust. "In trust nevertheless for the uses and purposes herein expressed, and for the equal and proportionate benefit and security of all the holders of said bonds, and for the payment thereof," and to secure the performance of all the things undertaken by the owner. The "trustee," his successor or successors, was appointed the attorney in fact for the owner "with full power and authority in the name and behalf of the owner to do any and all things which may be found necessary to carry into effect the purpose of this instrument," with full power to appoint a substitute attorney in fact with the same power and authority possessed by the said trustee. The deed provides that in case of default continuing after thirty days notice to the owner, the trustee may take possession of the property, operate it, and collect the income and profits and apply them to the satisfaction of the indebtedness and expense of administration, that he may sell the property after advertisement for four weeks, and that he may apply for the appointment of a receiver and for a foreclosure "by a court of proper jurisdiction." Other provisions are that the trustee may resign the trust, the vacancy to be filled by holders of the bonds; that he does not incur liability as to the right of the owner to make

the deed; that he shall be reimbursed for expenditures; that he shall be entitled to legal advice and counsel, and fees for the trustee; and that upon payment of the indebtedness he will cancel the deed of trust.

■ Counsel for the petitioners, in their brief in response to questions from this court, insist that the jurisdiction of the superior court of Chatham County "can be sustained under the principles recognized in 3 Pomeroy's Equity Jurisprudence, § 1086, to wit: "The power of courts of equity over the removal and appointment of trustees, independently of any statutory authority, or any directions in the instrument of trust, is well established. This power is confined to cases of actual express trusts. It can not, in the nature of things, extend to implied trustees, or trustees in invitum; nor does it apply to those persons who stand in fiduciary relations, and are for some purposes treated as trustees." That authority on its face does not support the contention; and further examination of the question is required. That necessitates a review of equity jurisdiction as it existed in England at the time when the English laws were adopted in this State, as far as applicable, the judiciary act of 1799 and subsequent statutes, and such additional historical facts as may throw light upon the question. The complete history would require a study of a vast field of judicial literature. Although an extensive study of this question has been made, which included the leading works on equity, and Wigmore's Panorama of the World's Legal Systems, the essential facts of such history will be stated as briefly as possible. While the jurisdiction of equity, or chancery as it was known in England, extends far back into the misty past, trustees, as they are known in connection with mortgage bonds or deeds securing issues of bonds, are of modern origin. Mr. Jones in his work on Corporate Bonds and Mortgages states, in the preface to the edition published in 1879, "Prior to the year 1860 the courts had only in a few instances been called upon to enforce railroad mortgages." The author has reference to mortgages securing issues of bonds. The business of issuing bonds on private property, for the erection of buildings such as that in the present case, we may safely say is even of more recent date than the issuing of bonds by railroad corporations. It becomes necessary, therefore, to ascertain whether such a "trustee" as that in the present case falls within the general jurisdiction of equity. It is

not disputed, but must be readily conceded, that in England the chancellor had general jurisdiction of trust estates and trustees. That is clearly stated in such works as Pomeroy and Story. According to Mr. Wigmore, trusts originated in the ecclesiastical courts. He also states: "The modern Anglican chancery practice can be traced directly back to Innocent III's institutions." 3 Wigmore's Legal Systems, 956.

Prior to the Roman legal system, there is no logically connected system revealed in all history. 1 Wigmore, 453. Even the judicial systems of oriental countries, such as China, Japan, Hindoostan, etc., followed and were patterned on that of Rome. Trusts were known in the Mohammedan or Islam countries as early as A. D. 1200, conforming to the Roman idea. 2. Wigmore, 563 et seq. They had their origin in religious doctrines. Certainly trusts and trust estates were originally within the jurisdiction of the ecclesiastical courts of England. In *Beall* v. *Fox,* 4 *Ga.* 403, 424, this court said that "the equitable jurisdiction of the court of chancery in Great Britain is founded upon and follows the civil law." In that case Judge Warner declared: "The principles of equity, as administered in Great Britain, were never intended to create a *new law,* but were introduced for the purpose of assisting and giving effect to the general laws of the realm. Equity follows the law, but does not control it. The office of equity is to protect and support the common law, and carry it into *practical* effect, to secure its protecting influence for the benefit of the subject, where by reason of its universality it would fail to accomplish that object. Equity, says Blackstone, in its true and genuine meaning, is the soul and spirit of all law. Here, by *equity* we mean nothing but the *sound interpretation of the law.* 3 Blackstone's Com. 429, 431. When we adopted the common law of England, we adopted it as an *entire system,* so far as it was properly adapted to the circumstances of our people; and the principles of equity, as there administered, for the purpose of giving a practical effect to those laws, constituted a part thereof. The principles of equity, as enforced by the court of chancery of Great Britain, were as necessary to give complete efficacy to the laws in the Colony of Georgia as in that country from whence the laws were derived. The first provincial governor of the Colony was therefore invested with the custody of the great seal, and, as chancellor within the province, had the same powers as the

Lord High Chancellor of England. 1 Stevens' History of Georgia, 387. A court of chancery was ordered, for hearing and determining all matters of equity, as early as 1754, to be held before the Governor as chancellor; and a master, register, and examiner were appointed as officers of the court. Ibid. 391. The ecclesiastical or canon laws of England were derived from the *civil* law; yet they constitute a part of the *unwritten* or common law of that kingdom. They owe their validity, says Blackstone, because they have been admitted and received by *immemorial usage* and custom. 1 Black. Com. 79. The same remark might with propriety have been made, with regard to the principles of equity, derived from the civil law." The court then proceeded to rule that the act of 1784, adopting the law of England adapted to our circumstances, and the judiciary act of 1799, conferred equity powers upon the superior courts necessary to give those laws complete and practical application. See also *Jones* v. *Dougherty,* 10 *Ga.* 273, citing 2 Story's Eq. Jur. § 1073.

It is a necessary conclusion that the laws, including equity, which have become part of the judicial system of Great Britain or England since May 14, 1776, are not the laws of this State, since the adopting act of 1784 included only those laws which were existing prior to that date. Cobb's Digest, 721. *Winkler* v. *Scudder,* 1 *Ga.* 108, 132; *Tucker* v. *Dennis,* 14 *Ga.* 548, 570. By the thirteenth century the English legal system had become a system of royal justice, and the chancellor and the chancery court had from the first been closely connected with the King's Special Council. 1 Holdsworth's History of English Law, 396, 399. Because the office of chancellor was usually filled by an ecclesiastic who leaned heavily on the inward intent of the parties, the jurisdiction of equity which had been originally confined to matters of grace, i. e. matters requiring special indulgence or provision, was extended to matters of conscience, and this became the working foundation of the chancellor's jurisdiction. Jenks' Short History of English Law, 211; and see Pomeroy's Equity Jurisprudence, § 33. Until the passage of the statute of uses and later developments of equity after the passing of the statute, the use and trust were practically identical. Therefore the history of uses is the history of trusts. Holdsworth's Historical Introduction to the Land Law, 141. The use or trust was originally used to evade the law. When testators were unable

directly to bequeath an inheritance or legacy to certain persons, if they did bequeath it to them, they gave it in trust to other persons who were capable of taking it. And therefore such bequests were called trusts, because they could not be enforced by law, but depended solely on the honor of those to whom they were entrusted. The Roman Emperor Augustus was troubled by numerous appeals in regard to these trusts, and he appointed a special prætor who was eventually given exclusive jurisdiction over trusts. Story's Equity Jurisprudence, § 966. As a result of the development of trusts, difficulty was experienced because of the fact that the legal title was in one person and the equitable title in another person. In such a situation the law court was remediless. The Roman law had given the prætor, specially appointed, jurisdiction over trusts. The requirement of good faith and the fact that usually the church was the beneficiary explains why the ecclesiastical courts first had this jurisdiction in England. By probing the conscience of the trustee they could force him to perform the trust as intended by the testator. Holmes's Early English Equity, Select Essays in Anglo-American Legal History, 714, 716. Since the chancellor was usually of the clergy, this subject-matter came within the exclusive jurisdiction of the chancery courts. This was the only method by which great inconvenience to the parties could be avoided, there being no remedy in law. In other words, all trust matters were forced into equity courts. It was at first thought that the statute of uses by its prohibitions would destroy this jurisdiction by destroying trusts; but the statute was interpreted in such a fashion as to eliminate only one type of conveyance, and the jurisdiction remained practically undisturbed. 2 Blackstone, 327, 336, Id. 432; Story's Eq. Jur., §§ 965, 966; Perry on Trusts (7th ed.), § 2-7; Pomeroy's Equity Jur. § 980.

It is perfectly clear that the jurisdiction of equity over trust estates and trustees at the time of the adopting act of 1784 did not include such trusts or trustees as that involved in this proceeding. Under well-recognized principles, equity jurisdiction such as we have adopted in this country from England included trust estates conveyed by deed or will for the benefit of those who were incompetent to hold or manage property in their own names. Trusts at that time were charitable trusts, trusts for married women, minors, persons incompetent for any reason, such as mental incapacity,

spendthrifts, and the like. Our Code, § 3729, declares: "Trust estates may be created for the benefit of any minor, or person non compos mentis," spendthrifts, and the like. *Sargent* v. *Burdett*, 96 *Ga.* 111, 117 (22 S. E. 667.). As to charitable trusts, see *Beall* v. *Fox*, 4 *Ga.* 403. The reason why equity had special jurisdiction over trust estates and trustees was because wards such as those we have just named, from motives of humanity, were deemed the objects of special care of the sovereign. When disposition of such matters became too burdensome for the personal action of the sovereign, the office of chancellor was created and endowed with authority to execute the sovereign power. Wigmore's Legal Systems, 956. Therefore when Georgia adopted the equity jurisdiction of England it adopted a jurisdiction that exercised its powers in behalf of such trust estates and trustees as have just been described, and had no reference to the modern idea of trusts and trustees for the benefit of bondholders. That ruling does not necessarily deprive the so-called trustee of the powers granted to him under the deed. Under the conditions stated he has the right to exercise those powers, one of which is to advertise and sell the property upon default in payment. Another is to go into the courts and foreclose and cause the property to be sold through a receivership. These powers are not affected by the fact that the trust, if any, was executed and the legal title passed into the holders of the bonds. *Cushman* v. *Coleman*, 92 *Ga.* 772 (19 S. E. 46); *Woodbery* v. *Atlas Really Co.*, 148 *Ga.* 718 (98 S. E. 472). An examination of the deed does not show any duties to be performed by a trustee; that is, a trustee in a strictly equitable sense, rather than the general sense. The status of the trustee in this instance is that of agent. Fletcher's Cyc. Cor. § 3178; Schroeder *v.* Berlin Co., 175 Wis. 79 (184 N. W. 542). Morley *v.* University of Detroit, 263 Mich. 126 (248 N. W. 570).

A security deed in this State conveys title and creates a specific lien for the bonded debt. As each bond was sold, it assigned a pro tanto portion of the security to the purchaser. When all bonds were sold, the entire security was automatically assigned to the purchasers. The grantee in the deed, called "trustee," held no further interest in the security, except by virtue of the powers conferred therein. Among them was the power to sell the property or foreclose in case of default. This was a mere power, separate

from ownership and title. Compare Equitable Trust Co. *v.* Milton Realty Co., 261 Mich. 571 (246 N. W. 500), s. c. 263 Mich. 673 (249 N. W. 30); Bankers Trust Co. *v.* Russell, 263 Mich. 677, 682 (249 N. W. 27). If it should become necessary to resort to a court to establish the fact that the "trustee" held the lien as trustee for the bondholders, a court of equity might be the proper forum. But that would be a proceeding affecting title, and not merely a proceeding to remove a trustee. It would be more in the nature of a proceeding to establish a trust and decree the person sued to be trustee. Petitioners disclaim any purpose in the proceeding of affecting the title. Of course the defendant in this case, in a general sense, is a trustee. All executors, administrators, guardians, officers of corporations, directors of corporations, and numerous others are trustees in the sense that they occupy fiduciary relations and have been "entrusted" with the property of others. *Fricker* v. *Americus Imp. Co.,* 124 *Ga.* 165 (52 S. E. 65); *Oliver* v. *Oliver,* 118 *Ga.* 362, 367 (45 S. E. 232). But there is a clear distinction between such trustees and the trustees over whom equity has general jurisdiction. *Heath* v. *Miller,* 117 *Ga.* 854 (44 S. E. 13), was a typical case involving the removal of a trustee of strictly equitable trust property. *Sanders* v. *Hinion,* 171 *Ga.* 702 (156 S. E. 812), was also a case involving a strictly equitable trust. Minors were cestuis que trust. The trustee appointed by will had died, and the proceeding sought the appointment of a new trustee. *Peoples National Bank* v. *Cleveland,* 117 *Ga.* 908 (44 S. E. 20), and *Hamil* v. *Flowers,* 133 *Ga.* 216 (65 S. E. 961), do not in any respect conflict with what has been said. Both of those cases sought recovery of property where the situs was in this State. No such recovery is sought in this case.

This court called on counsel for both sides for briefs upon specified points affecting the case. A statement from counsel for petitioners as to what section of the Code of Georgia the proceeding was based on was invited. Counsel replied that "Section 3744 of the Code of Georgia is directly in point," arguing that "more than 92 per cent. of the outstanding bonds and the absence of a few scattering bonds" constituted "substantially all of the beneficiaries under the trust deed," and that "the executrix of the maker of the deed is a party, and has no objection to the removal of the trustee." As we understand the record, the executrix of the maker

of the deed is not a party to the case, but the petition alleges that she has notice of the proceeding and has indicated that she has no objection to the removal. - An examination of section 3744 clearly shows that it does not apply in a proceeding like this. It authorizes the judge of the superior court to remove a trustee "on petition of *all of the beneficiaries* [emphasis ours] in the deed," etc. Clearly the removal can not be had under this section. It expressly provides that the judge of the superior court may act on petition of "all of the beneficiaries." The petition in this case expressly alleges that 92 per cent. of the bondholders, beneficiaries under the deed, have joined in the petition. It is argued that 92 per cent. is substantially all of the beneficiaries; but the Code does not authorize a proceeding by *substantially all* of the trust beneficiaries, and this court does not feel justified in giving to the plain and manifest meaning of the words employed in the statute a different meaning. The Civil Code (1910), § 3745, provides for the filling of a vacancy whenever "the office of trustee in any incorporated company ·may have or shall hereafter become vacant by death, resignation, or otherwise." There is no vacancy. Obviously this section does not apply. Section 3746 applies where a trustee has died or removed beyond the jurisdiction of this State. The trustee is in life, and resided in Tennessee when made trustee. So this section does not apply. Section 3747 is the only section wherein we have discovered any reference to a trustee created under a deed of trust or a mortgage securing an issue of bonds. That section does not provide for the removal of the trustee under any circumstances. It merely provides for the appointment of a new trustee when "the trustee fails to serve or perform his duties, or becomes incapable of doing so." Obviously this is not applicable. The instrument creating the trustee in this instance provides for filling a vacancy, but not for a removal. Section 3757 has reference to the right of a foreign trustee to sue in the courts of this State, and has nothing to do with the removal of such trustees. Section 3779 provides that "trusts of every kind, not generally cognizable at law, are peculiar subjects of equity jurisdiction." Even if this section could be so construed as to afford a court of equity jurisdiction of a proceeding to remove the trustee named for bondholders, it is qualified by section 3744, which requires all the beneficiaries to join in the removal proceeding. If for no other reason,

the proceeding can not be based on section 3779, because less than all beneficiaries are petitioners. The sections just mentioned have reference to the jurisdiction as exercised in England as described above, excepting only section 3747, where there is a reference to trustees for bondholders. There is no allegation that any of the petitioning bondholders in this case are not sui juris. It must be presumed, therefore, that they are all sui juris. *Sinnott* v. *Moore*, 113 *Ga.* 908, 913 (39 S. E. 415). Under well-recognized principles and controlling decisions of this court, a trust created for the benefit of adult bondholders is executed eo instanti. *Thompson* v. *Sanders,* 118 *Ga.* 928, 930 (45 S. E. 715) ; *DeVaughn* v. *Hays,* 140 *Ga.* 208 (78 S. E. 844). It is necessarily inferable from the petition that all of the bonds issued were sold by the so-called trustee; and therefore the entire trust for the bondholders, if any was created, became executed as the bonds were sold, and the legal title to the property, as a matter of law, is in the bondholders. We do not understand that counsel for petitioners claim that any of the sections of the Code, except 3744, apply. This proceeding is not authorized under any statute or Code section of this State.

■ The court erred in holding that this proceeding was authorized under the Civil Code (1910), § 5554, par. 5, 6. That section applies exclusively to actions in rem. *Irons* v. *American National Bank,* 178 *Ga.* 160 (172 S. E. 629), and cit. To hold otherwise would result in a collision with the due-process clause of the Federal constitution. The statute has no application to a proceeding such as this, where the sole object is to deprive the defendant of his right to act as trustee, and by express statement of petitioners does not seek to change the property rights, claims, or interests of any one. The trustee does not claim any interest or title in the property as his own. The superior court of Chatham County, under § 5554, par. 6, 7, could, if the pleadings authorized it, adjudicate all questions affecting the res, including the claim of interest by a non-resident. In the present case, however, the petition, if construed as seeking to adjudicate claim of title to the land for the reason alleged in the petition, would encounter an insurmountable obstacle. The reasons alleged for the removal of the trustee are chiefly: (a) That he has been convicted of a crime involving moral turpitude, and for that reason is unfit to serve as trustee. Petitioners also allege that the judgment and conviction

has been reversed and set aside by the Supreme Court of Tennessee. (b) That the trustee wrongfully deposited funds coming into his hands as trustee in a bank which subsequently failed, and through such wrongful deposit the funds were lost. The constitution of Georgia in two sections contains provisions which absolutely prohibit the courts from depriving one of his property or property rights because of conviction of crime. In art. 1, sec. 2, par. 3, of the constitution (Code (1910), § 6384) it is provided that "No conviction shall work corruption of blood, or forfeiture of estate." To forfeit the defendant's right of property or claim of title, if that be the object of the litigation, because of conviction for crime, would be to run counter to this clause of the constitution. For this reason the petition should not be construed to have that object. Even the General Assembly is powerless, under the constitution, to authorize such a proceeding. Art. 1, sec. 3, par. 2, of the constitution (§ 6389) provides: "No bill of attainder . . shall be passed." Bouvier defines "attainder" as "that extinction of civil rights and capacities which takes place whenever a person who has committed treason or felony receives sentence of death for his crime." Again: "The effect of attainder upon a felon is, in general terms, that all his estate, real and personal, is forfeited." Also: "In the United States the doctrine of attainder is now scarcely known, although during and shortly after the Revolution acts of attainder were passed by several of the States. The passage of such bills is expressly forbidden by the constitution." Among the rights accorded to citizens under the Code, § 2165, is the ownership of property. Since to construe this petition as one seeking to forfeit property rights of the defendant would be to make it fatally defective, it is construed, as counsel for petitioners state in their brief, not to affect title to the property, but solely for the removal of the trustee. Petitioners (defendants in error) in their brief state: "We do not ask for the recovery of property in this State." That admission is manifestly in accord with the record. Necessarily, then, the proceeding is one in personam, against one not a resident of this State. The plea to the jurisdiction should have been sustained.

*Judgment reversed. All the Justices concur, except Russell, C. J., who dissents.*

BELL, J., concurs in the result, on the ground that the suit was

an action in personam, and in the absence of personal service or its equivalent the court was without jurisdiction. *Irons* v. *American National Bank,* 175 *Ga.* 552 (165 S. E. 738), s. c. 178 *Ga.* 160 (supra); *Royster Guano Co.* v. *Sledham,* 178 *Ga.* 217 (172 S. E. 555), and cit.